**LOWRY, ESTATE OF, In Re**

**POPPLETON v LOWRY**

Ohio Appeals, 2nd Dist, Franklin Co

No 3296. Decided June 6, 1941

Ray W. Poppleton, Columbus, for complainant-appellee.

Clarence M. Addison, Columbus; Phil S. Bradford, Columbus, and James E. Hale, Columbus, for respondent-appellant.

## OPINION

By BARNES, J.

The above-entitled cause is now being determined as an error proceeding by reason of defendant's appeal on questions of law from the judgment of the Probate Court of Franklin County, Ohio.

The action was commenced in the Probate Court through the ancillary administrator of the estate of William D. Lowry filing a complaint against Kate E. Lowry, charging her with concealing, embezzling or conveying away moneys, goods, chattels, things in action or effects belonging to the estate of the decedent, and in fraud of the rights of the affiant and others interested in the estate.

A writ of citation was issued to the said Kate E. Lowry, requiring her to appear before the court forthwith, then and there to be examined under oath touching the matters set forth in the complaint.

The proceeding was brought under favor of §10506-67 et seq. GC, for the purpose of discovering and regaining possession of the assets of the estate of William D. Lowry.

In obedience to the order of the court, Kate E. Lowry appeared and without further pleading or issues, the matter was heard on the complaint and the Probate Court found that the defendant, Kate E. Lowry, was guilty as charged in the complaint, except as to two small items thereof.

Following the court's announcement of its opinion, counsel for the defendant prematurely filed motion for new trial. Thereafter the court took further testimony on the question of the value of the property involved in the alleged conversion or concealment, and at the termination of said hearing announced his finding of the determined value of $41,405.64.

Again the defendant prematurely filed motion for new trial, but in the journal entry which followed, the motion for new trial was overruled.

At a previous term we considered and overruled motion filed by appellee to dismiss the appeal upon the claimed ground that no motion for new trial was filed and for that reason the cause could not be reviewed on the weight of the evidence. In overruling the motion to dismiss, we stated that under no consideration would such a procedure be proper, and made the further suggestion that if counsel desired to save their question they might either file motion to strike the bill of exceptions from the files or present their argument in denial of the right of our court to consider the bill of exceptions on review.

In deciding the motion to dismiss, we went further and discussed the state of the record, together with the probable legal effect of filing a motion for new trial prematurely.

While not desiring to foreclose further argument on the question, authorities were cited tending to hold that the overruling of motion for new trial, even when filed prematurely, would preserve the record.

Following our determination on the motion, counsel for appellee filed motion to strike the bill of exceptions from

172

the files, and accompanied the motion with memorandum of authorities. These are the same authorities previously submitted on the motion to dismiss.

In line with our previous announcement, we overrule plaintiff's motion to strike the bill of exceptions from the files.

Final judgment against the defendant was in the sum of $41,405.61, plus 10% penalty, making a total finding of $45,546.20. There was a further order in the nature of an alternative judgment that if the said Kate E. Lowry would restore to the William D. Lowry estate 516 shares of Procter & Gamble stock and 100 shares of the common stock of the Diamond Match Company, that said amounts would be credited against the total judgment and a balance of $8,127.27 would be due and payable.

Within statutory time the cause was lodged in our court through notice of appeal on questions of law.

Appellant's assignments of error are set out in seven separately numbered specifications. All except Nos. 4 and 5 may be restated under the separate heading in substance that the finding and judgment of the court are contrary to the law and the facts.

Assignment No. 4 complains as to the admission of certain evidence objected to by the defendant; specification No. 5 claims that the court erred in refusing evidence offered by the defendant.

A rather full and complete statement of the facts is essential to an understanding of the nature and scope of the controversy.

The defendant, Kate E. Lowry, was a widow. aged about seventy-one years, and the mother of William D. Lowry, deceased, whose estate is being administered. Defendant's former husband was Harry Lowry, and at the time of the trial he had been dead about six years. Mrs. Lowry, in addition to William D. Lowry, had surviving a daughter, Mrs. Ida O'Day.

The deceased husband, Harry Lowry, had for a number of years preceding his death worked for the Procter & Gamble Company as a traveling salesman. During his many years of employment with this company he became interested in and acquired quite a large volume of stock, always, however, placing the same in the name of his wife, Mrs. Kate E. Lowry.

The defendant, Mrs. Lowry, inherited quite a sum of money from her family.

The son, William D. Lowry, deceased, was near fifty years of age at the time of his death. He lived in New York' and had followed in the footsteps of his father as a traveling salesman. He worked for the Diamond Match Company. He was survived by his wife, but left no children. A former wife had procured a divorce, so that the present wife was decedent's second.

The daughter, Mrs. O'Day had been previously married and divorced. Her present marriage to Larry O'Day, who is surviving, is of questionable desirability. According to his admissions on the witness stand, he was a minister, connected with the numbers racket and had also served a term in the Michigan penitentiary.

For a great number of years, going back as far as 1929, the defendant, Kate E. Lowry, had a safety deposit box in the Huntington National Bank, in which she kept her valuable papers and securities. At various times the son, William D. Lowry, and the daughter, Ida O'Day, by written direction were designated as deputies. These writings were on the regular form furnished by the bank and in fact authorized the deputy to have access to and control of the contents of the deposit box in the same manner as the principal. This box number was 2999.

The incidents happening on October 11, 1938, become very important in this narrative. On this date Box No. 5212 at the Huntington Bank was taken out in the name of W. D. Lowry, whose residence address was given as care 954 East Whittier Street; Kate E. Lowry, (mother) of 954 East Whittier Street, was designated as deputy. The defendant, Mrs. Kate E. Lowry, claims that this box was procured and rental paid

for by her at the suggestion of her son, William D. Lowry, and taken out in his name for a definite purpose and reason. At this time W. D. Lowry lived in New York. Mrs. Lowry testified that it had come to the attention of herself and the son, William D., that the husband of the sister, Ida, had a criminal record. At first the family did not believe these reports and according to the testimony of the mother, the son, W. D. wrote up to Michigan and received reply verifying the reports.

The securities and cash of a total value of some $41,000.00, were removed from box 2999 and placed in box 5212, on October 11, 1938. The securities consisted of 510 shares or 516 shares of Procter & Gamble stock; 100 shares of Diamond Match; $2900.00 of United States Treasury bonds and currency in the sum of $860.00.

The Procter & Gamble and the Diamond Match Company stock were originally issued to the mother, Kate E. Lowry. The United States Treasury bonds were payable to bearer. Both the Procter & Gamble and the Diamond Match Company certificates of stock bore the endorsement of Kate E. Lowry in blank. The only evidence as to when the blank endorsement was placed on these certificates was that of the mother, Kate E. Lowry, and she testifies it had been done many years before at the suggestion of her son, he giving as the reason that it would simplify the settlement of the estate following her heath.

According to the testimony of Mrs. Kate Lowry practically one-half of the total value of her estate was placed in this safety deposit box, No. 5212.

It is the claim of Mrs. Kate E. Lowry that she was induced to make the deposit of the cash and securities at the instance of the son, W. D., so as to protect him from the sister and her husband getting possession of or making away with the cash and securities following the death of the mother. The mother very positively and repeatedly denies that any delivery of the property in question was made to the son, W. D., but states that this property was only placed in this box at the suggestion of the son and for his protection.

The bank has a rule that any authorized person entering the box must sign a card, giving day and date. From this card it appears that the son, W. D. Lowry, never entered the box after it had been taken out in his name in October, 1938. The card does show that Mrs. Lowry entered the box on different occasions, as follows: July 23, 1939, at 10:15 A. M.; October 14, 1939, at 11:16 A. M.; December 30, 1939, at 9:31 A. M.; January 2, 1940, at 9:31 A. M.; January 8, 1940, at 12:40 P. M.

Mrs. Kate E. Lowry had in her possession and introduced in evidence a receipt for payment of rent for the box for the second year This receipt is introduced in evidence as Respondent's Exhibit No. 10, dated October 11, 1939, showing the rent paid, $3.00 plus 30c tax, or a total of $3.30. At the head of the receipt is marked "charge Kate E. Lowry".

No officer or employe of the bank appeared and gave testimony as to any recollection pertaining to the transaction relative to the safety deposit box. Photostatic copies of the records of the bank, as they pertain to the two safety deposit boxes, were introduced in evidence by stipulation.

So far as the record shows no one was present besides Mrs. Kate E. Lowry and her son, William D. Lowry, during any of the talks relative to the procurement of the safety deposit box No. 5212, or at the time it was procured. It necessarily follows that the record presents no testimony relative thereto other than that of Mrs. Kate E. Lowry.

The son, W. D. Lowry, died on Christmas Day, 1939, in a hospital in New York City. The mother, Mrs. Kate Lowry, was at the hospital at the time of and preceding his death. On the day following she returned to Columbus, and shortly thereafter went to the bank for the purpose of entering this box, No. 5212. The officers of the bank, having in charge the safety deposit boxes, had read in the newspapers of the death of the son, W. D. Lowry, and

refused to permit Mrs. Lowry to enter the box at that time. The son, William D. Lowry, was buried in Columbus about the 28th of December, 1939. On December 30, 1939, Mrs. Kate E. Lowry, in company with her lawyer, Phil Bradford, and a deputy county auditor, representing the State Tax Department, went to the bank, procured the deposit box and then and there the deputy county auditor listed the assets contained therein. The daughter, Mrs. O'Day, accompanied the party to the bank but did not enter the department where the safety deposit boxes were kept. At that time Mrs. O'Day was supposed to be estranged from her husband and either previously or shortly thereafter had instituted an action for divorce.

On January 2, or January 8, 1940, Mrs. Kate E. Lowry removed the assets from the box 5212, and placed them in Box 2999.

On January 2, 1940, Mrs. Kate E. Lowry named her daughter, Ida O'Day, as her deputy to box 2999.

Some time in February or March following, the daughter, Ida O'Day, entered box No. 2999, and stole therefrom Government securities and the sum of $1500.00 in cash; part of which had been taken by Mrs. Kate E. Lowry from box 5212 and placed in box 2999. The Government securities were the same as had been transferred from box 5212.

It is in evidence that at the time the box was opened in the presence of the deputy county auditor representing the State Taxing Department, the assets therein were in three separate envelopes. The envelope in which was contained the shares of stock of the Procter & Gamble Company and the Diamond Match Company had an endorsement thereon said to be in the handwriting of W. D. Lowry. This legend reads as follows: "516 shares of P. & G. 100 shares Diamond Match". Then follows immediately thereunder the following: "Kate E. Lowry personal property".

Opposite and to the left of the writing listing the shares of stock is a brace mark and opposite the figures 9/1-32. This envelope was introduced in evidence and marked "Respondent Kate E. Lowry's Exhibit No. 1". Phil Bradford testifies that the securities were in the envelope at the time the box was entered on December 30, 1939. Mr. Bradford further testifies that the currency, amounting to something over $800.00, was also in an envelope and had marked thereon the same legend. He also testifies that the Government securities were in an envelope. but he does not remember whether there was any legend on this envelope.

There were also presented in evidence on behalf of Mrs. Kate E. Lowry two witnesses who testified relative to conversations had with the son, W. D. Lowry, relative to the securities and assets contained in the deposit box at the bank.

The first was Sylvia Hatfield, an unmarried lady, twenty-seven years of age, living in Columbus, and secretary and treasurer of the Ra-Lite Neon Sign Company, and acting in this capacity for seven years. Miss Hatfield and her family were very close personal friends of the Lowry family. In the last year or so the son, W. D. Lowry, wrote to Miss Hatfield very frequently and usually would advise her when he was coming to see his mother, which occurred about once a month, and on these occasions they would be together. Miss Hatfield did not know that Mr. Lowry was then married, although she did know that he had been previously married and divorced. She testifies that on Thanksgiving Day, 1939, he talked to her rather freely about his sickness and his business; of his having a will and also about his mother's business. The following question was then asked:

"Q. What did he say about his mother's business?

A. He said that his mother and he had a lock box together in the bank but that that was for his mother's protection; his mother's papers were in it.

Q. Did he say in whose name the lock box was taken out?

A. He told me it was in his name but his mother paid for it.

Q. Did he say anything about the contents of that box?

A. 1 know he told me about the letter from his father and he told me the rest of it contained some cash and stocks and bonds.

Q. Did he say anything to you about who owned the cash and stock and bonds?

A. He did. His mother owned them.

Q. He told you his mother owned the stock and bonds and cash that were in the box in his name?

A. Yes."

Mrs. Ruth Thomas was also called as a witness. This witness was a practical nurse and had known the family for a long time, having assisted in a professional way in taking care of the husband of Mrs. Kate E. Lowry. Some time in November of 1939, she was called by Mrs. Kate E. Lowry to assist in nursing the son, William D. Lowry, who had just returned from the Mayo clinic. She fixes the time as around the 17th or 18th of November, 1939, and was engaged in the service about three days. The record presents the following questions and answers of this witness:

"Q. Say whether or not Will talked to you about his sister.

A. Yes, it worried him quite a bit because he had quarreled with his sister, and he being ill it seemed like he worried a lot about it.

Q. Did Will say anything to you about his sister's husband, what kind of a man he was?

A. Yes, he did; he said he had a criminal record, and he feared for his mother.

Q. In that connection did Will Lowry say anything else to you?

A. Yes, he did; he told me that he had his mother get a safety deposit box in his name and had her put her stocks and bonds and other valuables in it, because if his mother would die he was afraid his sister would enter the box and remove, and he also said

that the entire contents of the box belonged to his mother."

In rebuttal, counsel for the complainant called Mrs. Thyrza Cohagen. Mrs. Cohagen was a resident of Long Island, New York. Her husband was working for the same company as did Mr. William D. Lowry, and the families were friends. She was at the hospital shortly preceding and at the time of the death of William D. Lowry. During her visits to the hospital she became acquainted with Mrs. Kate E. Lowry, who was also in the hospital because of her son's illness. She testifies to a conversation she had with Mrs. Kate E. Lowry relative to the securities which were in the safety deposit box in Columbus. The following questions and answers appear in the record:

"Q. I will ask you if you had any conversation with Mrs. Kate Lowry with respect to securities which were in a safety deposit box in Columbus.

A. She didn't mention safety deposit box but the day before, when she knew he was seriously ill, she said that she had given Bill some stock and I said to her, 'Well, have they been transferred?' She didn't know, and she said she wondered what she would do with them, and I said, 'Who had gotten the dividends?' and she said there had been no dividends due at that time so, of course, she didn't know whether they were transferred or not; what these stocks were, I don't know."

\* \* \* \* \*

"Q. Can you think of anything else now that you haven't related?

A. That she might have said regarding the stocks?

Q. Regarding property of any kind or character, in this conversation.

A. That was all."

Other testimony to which considerable importance is attached was presented through the cross-examination of Mrs. Kate E. Lowry. Some twenty or more letters were presented and Mrs. Lowry identified these as having been written to her son, covering quite

a period of time. With the exception of one letter, none makes any reference to the securities in question or the safety deposit boxes. They are contradictory to Mrs. Lowry's testimony that she and her son were extremely close and harmonious and that she relied upon him and took his advice in everything. These letters disclose a very bitter feeling towards the son. She repeatedly criticized him because he refused to follow her advice as to whom he should marry. ·She had repeatedly written him that she would disinherit him, that he was a liar and that he need never enter her door again, that he was a fool, that she never would forgive him, that he need not write her any more letters. It further appears from the letters than Ida and Will had charged their mother with robbing them of their share of the father's estate. It further appears from the letters that the mother bitterly criticized Will because of his religious leanings and because of his reading of the Bible. The letters also show that the mother boasted of her independence and her smartness and failed to agree with her son on any subject.

The entire record presents very clear evidence of a dual personality on the part of Mrs. Lowry. It may be correctly stated that these letters, admittedly written by Mrs. Lowry, were contradictory of her testimony of love, affection and dependence on her son and might properly warrant the trial court in questioning the value of her testimony as a whole, yet we are unable to see that anything in the letters would be a moving cause or inducement to her in giving her property to her son William. In fact, the contents of the letters would disclose a very strong reason why she would not so do. Of course, no claim is made or could be made that these letters are substantive evidence on the issues presented, but could be and only were presented for the purpose of impeachment.

· While we might have a theory as to the actuating cause for the writing of these letters, yet we will not disturb or question the determination of the trial court that the testimony of Mrs. Lowry was entitled to very little credit. As we understand, the trial court based his conclusions that a presumption of ownership is presented by reason of the facts that the assets in question were in a safety deposit box of William D. Lowry, and that sufficient evidence had not been presented to overcome that presumption.

We agree that the possession of the property raises a presumption of ownership. The force of this presumption is varied, according to existing facts. Where strangers are dealing at arm's length, the presumption is much stronger than where family relations exist. It is a matter of common knowledge that families place their respective valuables in a safety deposit box in the name of one member of the family. When this is done it is usually for the purpose of saving expense of an extra safety deposit box.

It is argued that Mrs. Kate E. Lowry's explanation as to why the second box was procured in the instant case, can not ring true for the reason that even if there was an apprehension that the daughter or her husband might obtain possession of the contents of the first safety deposit, this could have been obviated by not designating Mrs. O'Day or her husband as a deputy. We do not feel that it is unbelievable that the son, William D. Lowry, might have had an apprehension that his sister, Mrs. O'Day, might procure such authority and could well feel that if the securities were in a box in his name that this sister could not gain entrance thereto except on his authority.

The future developments would justify such a conclusion, since Mrs. O'Day was appointed deputy and thereafter proceeded to steal therefrom a part of the securities and cash.

The query arises that if Mrs. Kate E. Lowry did intend to make a gift of the securities and cash in question to her son, why the necessity of making his mother the deputy. There is also a further situation, hard to under-

stand, that if the son was the actual owner of the property, why he left the cash in this box from October, 1938, until the time of his death in December, 1939; also why would the securities not be sent for in the issuing of new certificates in his name, as is the usual practice where securities are transferred; further, why would these securities and cash, which were placed in three different envelopes, have endorsed on at least one of them in the handwriting of William, the legend in effect that the contents of the envelopes were the personal property of Kate E. Lowry?

To these may be added the further circumstance that during the monthly trips of the son, William D. Lowry, to Columbus, he never entered this safety deposit box.

The evidence of Miss Sylvia Hatfield and Mrs. Ruth Thomas, heretofore quoted from, certainly is sufficient to overcome any presumption that may arise from the fact of the securities being in a safety deposit box in the name of the son, William, at the time of his death.

In so doing we take into consideration the testimony of Mrs. Cohagen, as well as the letter written by Mrs. Kate E. Lowry, to her son, William.

While Mrs. Kate E. Lowry denies the conversation with Mrs. Cohagen, yet if accepted as presented, we do not think it is as strong a declaration against interest as was the testimony of Miss Hatfield and Mrs. Thomas.

We recognize that reviewing courts are slow to reverse trial courts on the weight of the evidence and we do so in this case with great reluctance. However, the obligation is ours to determine every question on review, as we see it.

We are constrained to the view that the judgment of the trial court must be reversed.

There are two other grounds of error which remain undisposed of. We take these up at this time solely for the reason that the statute requires us to pass on all errors assigned. However, we shall do so rather briefly.

Specification No. 4 reads as follows:

"That the court erred in admitting evidence offered by the complainant and objected to by the respondent."

We learn from the briefs that this particular specification of error refers to the admission, over objection of respondent to letters written by Mrs. Kate E. Lowry to her son, William.

We have heretofore stated that these letters with the exception of one are not substantive and can only relate to the credibility of the witness, Mrs. Kate E. Lowry. Of course, the rule is well recognized that impeaching testimony must relate to pertinent questions.

The respondent in the introduction of her testimony did testify at some length as to her feelings towards her son and her dependence upon him. But for her testimony in chief, these letters would not be admissible. We find no error under this specification.

Specification of error No. 5 reads as follows:

"The court erred in refusing evidence offered by the respondent."

Again we gather from the briefs that this objection refers to letters written by the decedent, William D. Lowry, to Miss Hatfield. Counsel for respondent claim that they should be admitted for the purpose of refuting certain imputations raised through the cross-examination of this witness. It was brought out in testimony that at the time Mr. Lowry was paying attention to Miss Hatfield that he was a married man. She testified that she did not know that he was married. The nature of the cross-examination was calculated to create some doubt as to her proper conduct. We are inclined to think that the court could properly have admitted these letters in testimony, but we do not find that its refusal so to do constituted prejudicial error.

The judgment of the trial court will be reversed and the cause remanded for new trial.

Costs in our court will be adjudged against the appellee.

Entry may be drawn accordingly.

GEIGER, PJ. & HORNBECK, J., concur.